Thank you, Your Honor. May it please the Court, my name is John Riper. I represent the plaintiffs and appellants, Weinstein & Riley Law Firm and Bill Weinstein, its founder. I'll refer to them collectively as WWR, as we did in our brief, or simply as the insured. At the center of this appeal is the legal standard that the trial court imposed for defining what defense costs are reasonably related to a covered claim. And that's central to the appeal because that legal standard defines what costs the insured is entitled to under the policy, and therefore what contractual liability. When you say the trial court, Oregon or Washington? Washington. And thank you, Your Honor. I'll try and be consistent when I say the trial court, I mean the court below in this appeal. Generally, I'll try and refer to the collateral litigation as either the Washington court or the Oregon court, depending on which aspect of it. The insurance policy that Westport sold to the insured promises a full defense of covered claims. It promises a full defense of covered claims wherever they arise and whenever they arise if they fall within the coverage scope of the policy. Now, as frequently happens, a covered claim in the underlying litigation, when it was filed in the Washington state court, involved both covered claims and uncovered claims. And in that situation, a defense of the covered claims involves at the least what it would cost for the insurer to hire an attorney solely to defend the covered claim. If the insurer is not paying what it costs for a competent defense attorney hired solely to defend the covered claim, if it's not paying those costs, then the insurer isn't paying the full cost of a defense of the covered claim. And because that's the benefit of the bargain that the party struck when the insured buys the policy, that is the test that is applied for determining when there are defense costs that may benefit both uncovered and covered claims. That is the test for what is reasonably related to a covered claim. And the courts say there isn't going to be any allocation of defense costs when they reasonably relate to a covered claim because the bargain in the policy is a full defense of the covered claim. So costs that are reasonably related to defense of the covered claim, those are allocated 100% to the insurer and the insurer must pay those costs and doesn't get to lay off some or all of them onto the insured for the insured to pay. And the test for what is reasonably related is would a competent defense attorney hired solely to defend the covered claim have undertaken that effort? If the answer to that question is yes, that is the definition for reasonably related to a covered claim and that is part of the defense obligation to either furnish that attorney and pay that attorney or if the insured is furnishing the attorney, to pay that cost. So that is what the legal test is under the Continental Casualty, the Potomac Electric, the Nordstrom v. Chubb, and the Bordeaux cases that we set out in our brief. That is the reasonably related test. But that is not the test that the trial court imposed. The trial court imposed a test taking a hypothetical world, a hypothetical world where there were no uncovered claims, a hypothetical world where the only claim that existed was a covered claim. And the trial court said, my test is I am going to take that hypothetical world and then I am going to look at all the costs that the insured actually paid to defend all the claims and I am going to allow only the costs that would have been undertaken in that hypothetical world. And in my hypothetical world, if there were costs that were undertaken in the real world for both claims, but if all those uncovered claims that the insured had to deal with didn't exist at all, the only thing was this covered claim, if those efforts wouldn't have been undertaken, then I am going to declare they are not part of the defense benefit in the policy. That was the test that the trial court adopted and imposed. No other court has ever applied that test to any case that we can find. There are two instances where there was a recital of language in dicta that referred to the notion of defense in a case where only a covered claim was pledged. What kind of help did your client provide? I assume you are talking about the district court. Judge Robarts? Yes. What kind of help did your client, the firm, give Judge Robarts in terms of identifying with precision covered and uncovered claims? We did the same thing in two steps. The first step was before we started the lawsuit in Judge Robarts' court at all. We took all of the defense costs up to that point, and this was about four or five months before we started our lawsuit. We took all of them, and my office, a coverage attorney in my office, gave written directions to the trial attorneys that were defending the whole litigation and said this is the test. Go through all of your bills, and you are to physically highlight every single entry where if you were hired only to defend this covered claim, which everybody agrees is a covered claim, if you were hired only to defend this covered claim, then you highlight it. If you would not perform that work if you were hired only to defend the covered claim, then don't highlight it. And they spent many hours doing that physical yellow highlighting allocation, and that whole package was sent to Westport so that Westport could adjust, confirm its own determinations, declare what it owed under that test, and pay it. And they didn't do that. They reviewed those records, and they came back and they said, well, we think we might be liable for some of that, and we'll offer to settle for $151,000 if you'll give us a release from any more liability. And we said no. We reject that settlement offer. Thank you. Please do your job. Adjust the loss. Determine what you owe and pay it. And they wouldn't do that. Is it your position that Judge Robarts was required mechanistically without a subtraction to adopt all the yellow highlighted portions of the bills? No, Your Honor. And the second part, to answer directly, was when we brought the lawsuit, we had the actual defense attorneys do the remainder of that exercise for all of the bills after that, because they had to continue for another year plus of actual defense work. So they did that actual allocation using the Continental Casualty Potomac electric test. We submitted those as exhibits. I then put both trial attorneys on the stand. I had them walk through how they did the test. I had them confirm that that was our allocation of what those were. They were subjected to cross-examination. The defense attacked some specific entries. And so that was the record that we tried. We advocated the test that is the test. We did what we viewed as the best job we could of making it as easy as possible for the trial court to apply that test to the evidence of the actual bill. So the position of Westport going in was that $151,000, give or take, was due? No, and that's an excellent question. The position of Westport, which the testimony of their adjuster, the trial testimony of their adjuster. I'm looking for a number, not elucidation. Zero. They took the position of zero. But they had already agreed to pay $151,000, hadn't they? Not quite, Your Honor. They had agreed to advance $151,000 as part of an agreement to mediate. And they did advance $151,000, and that very agreement says right in there that Westport is declaring it does not admit it owes a penny and it has the right to sue to get it all back. What was your client's position as to what was owed? Our position when we got into that. Looking for a number again. At the point that they did the $151,000. You know, if I ask you what time it is, you don't tell me how to build a clock. I'm looking for a number. About a half a million dollars. $500,000. At that point when they did that $151,000 deal. And Judge Robarts determined that it was, what, 181? That's darn close, yes. Okay. And did you file objections line by line to his determination? We filed an appeal on his use of the legal standard that he used, yes. But his judgment came out about eight months after the trial as, here's the decision, here's the findings and conclusions, and we took an appeal from that. Okay. So the difference as a practical matter, the difference between what the Potomac Electric case called for being done and what Judge Robart imposed as the legal test is best illustrated by the depositions of Bill Weinstein. His adversaries took his deposition three times. It went on for day after day after day. A defense attorney retained to defend just the covered claim would be attending the deposition of his client because he's likely to be asked questions that could bear upon the covered claim. But under Judge Robart's view, those depositions were being taken for larger reasons, and apparently it was Judge Robart's view that those depositions wouldn't be taken if there was a lawsuit with just the covered claim. So that was an example where Judge Robart didn't allow defense costs. But that's just a microcosm of the bigger picture because the factual and legal issues that the parties were wrangling over were a very difficult entanglement of law firm and private business that the stockholders had been separated from. That's a kind way to describe it, but we'll accept it for the moment. Thank you, Your Honor. It was a highly fractious, very difficult, obviously very controversial set of underlying disputes, and the parties on all sides were spending enormous amounts of money litigating them, and there were millions and millions and millions of dollars at stake. So it made a huge difference whether the legal test that's based upon the full benefit of the insurance bargain is applied, or whether the legal test of, no, we're only going to look at a hypothetical world where the only claim that exists is the covered claim. And the one case where exactly this situation came into play and the court was required to rule on it and explicitly did is the Potomac Electric case. In Potomac Electric, there was a covered claim. There was also a criminal grand jury proceeding. The insured incurred defense costs in the criminal grand jury proceedings where there were no covered claims at all. It was purely criminal grand jury. And the question came up, and it was part of the coverage suit, can the insured claim costs it had in the criminal grand jury on the theory that they reasonably related to defense of a covered claim? And the court said, this is the standard. If a competent attorney retained solely to defend the covered claim would have engaged in those activities, even though they also benefited completely uncovered claims, then they are reasonably related and they are part of the insurer's obligation. Does Potomac involve a state or federal grand jury? I don't know. It was a pollution case, so it could have been either. Because some state grand juries allow attorneys to be present. That is absolutely forbidden in a federal grand jury. Your Honor, I don't know. I'm wondering what a lawyer representing someone who is testifying in a federal grand jury would do that might be covered. The case does not recite the details of what they did, and it could have been things as simple as investigating. I can't tell you because the case doesn't say. But what the case does say, and what the holding explicitly says is, if the insured proves that a competent attorney hired solely to defend the covered claim would have engaged in whatever those things were, then the insurer is obligated to pay 100% of those things. Tie goes to the runner. Tie goes to the runner. Because that is what the promise to provide a full defense of the covered claims looks like. We were not afforded that test trial, and so we were not afforded the full defense benefit that we had been promised. That's why I say that was central to the case in front of Judge Robert and is central to this appeal. A second issue on this appeal is the right to select counsel to conduct the defense. Among the various states, there are two different ways that state laws go about ensuring that in a mixture of covered and uncovered claims, the insured actually gets independent counsel to perform a defense for the insured's benefit. In one system, not in Washington, but in a number of other states, in one system, the insured gets the right to pick the counsel. So there's assurance that it's going to be independent because the insured gets to pick them. In other states, of which Washington is one, the insured does not get any automatic legal right to pick the counsel. Instead, the law imposes on both the counsel appointed by the insurer and on the insurer the requirement that they both acknowledge and perform with the understanding that the appointed defense attorney is completely independent from the insurer, and it is a violation on both their parts if the interests of the insurer are taken into account by the appointed defense counsel in conducting the defense. So that's the second system. In states where the first system is used, the insurance industry many years ago developed the Coomis Clause, and the Coomis Clause says if you, the insured, have the right to select independent counsel, then the following minimum criteria and standards will apply. For the Westport policy, Westport took the Coomis language and they changed it, and they changed the very first sentence so it no longer says if you, the insured, have the right to select independent counsel. Instead, they turned it into a promise, and they said if you have the right to independent counsel, then you have the right to select the attorney. So they made a benefit promise in the policy that isn't required by Washington law and isn't standard in the states where that is required. Does that mean in the context of an errors and omissions policy with the language you described, where the insured is an attorney, that the insured can select himself or herself? I don't know, and I'm fairly confident Washington has never faced that question. And my guess is that it would imply not just if the insured was an attorney but a pro se litigant. I don't know the answer to that. Counsel, you're down to a minute and a half. Would you wish to reserve any time for rebuttal? Yes, Your Honor, I'll reserve the remainder of my time. Thank you. Good morning, and may it please the Court. My name is Robert Conlon, and I represent Westport Insurance Corporation. Following a four-day bench trial, Judge Robart, having heard seven witnesses' testimony, having read thousands of pages of literally hundreds of exhibits that were entered into evidence, and having read hundreds of pages of pre- and post-trial briefing, rendered a well-reasoned 63-paged opinion with 90 findings of fact detailed and 93 conclusions of law. Findings of fact 1 through 3 were under the heading credibility of witnesses. And he found, as the trier fact, which gives special deference here, we cited the Allen case out of the Ninth Circuit. He found that the plaintiffs, and if that's okay with you, when I say plaintiffs, I mean Mr. Weinstein and Weinstein & Reilly, the law firm. He found their witnesses, which were basically Mr. Weinstein and his trial counsel, biased and gave credit to Westport's witnesses as far as what was reasonably related to the one loan-covered claim here, which was the failure to withdraw that was pled in the Washington case. He gave credit to our witnesses over their witnesses. And then after looking at all this evidence and mounds of paper, he found that Westport did not breach its duty to defend, did not breach its duty of good faith, and also found that the plaintiffs who carried a burden here did not prove that a vast majority of the expenses incurred in Oregon were reasonably related to the loan-covered claim, the failure to withdraw, that was pled in Washington. And that's findings of fact and conclusions of law of 53 and 90. Your opponent says that he used the wrong legal standard. I know. And the judge used the exact standard that was espoused and announced by the Supreme Court, the High Court, I think they call it the Court of Appeals in Maryland, the High Court of Maryland in Continental Casualty, he used that test verbatim. And I'd like to point out to this panel that the pretrial briefing, the plaintiffs espoused that exact test verbatim, and that's what Continental Casualty used and that's what Judge Robart used. What they're seizing upon by saying that the wrong standard was used is something I call the PEPCO case, the Potomac Energy, the environmental. There's a PCB. They quoted, and again, that's a district court case in the District of Columbia. They quoted Continental Casualty and adopted the test, but used brackets and ellipses. And they seized on that to say, well, and again, this is a shift of position from their pretrial brief that they submitted to Judge Robart after the evidence came in. And I want to point out that a couple very important facts, which I think explains why they did change courses here on what the test was. Finding of Fact 82, Hall and Claflin, that's their trial counsel that submitted the testimony, did not attempt to allocate according to the Continental Casualty test. Finding of Fact 83, they did not attempt to allocate time spent relevant to the defense of the potentially covered claim as opposed to time spent on issues irrelevant thereto. Can I interrupt with a question? Sure. At some point prior to litigation, the carrier offered $151,000. They did. And in arriving at that number, did it use, take advantage, or have input from the experts it later called at trial? We did not call any experts at trial. We called the attorneys who represented the attorneys that were involved in the litigation against plaintiffs in Oregon to understand what was going on. The witnesses to support your client's position were not involved in the determination of the 151 figure? Well, to the extent, it's an excellent question, to the extent their testimony made very clear that nothing was ever asserted against the plaintiffs in Oregon dealing with the failure to withdraw claim. That was one important point. And it made sense because the attorney for Beeline said, we abandoned that claim. When we filed the lawsuit against plaintiffs in Washington, it stayed promptly thereafter. And then this commercial non-covered litigation in Oregon carried on. The attorney for Beeline said, yeah, we abandoned it. We looked at it, and it was not a case that had merit, and the damages were de minimis. We had the structure in place, the technology to be able to file these forms, so we didn't pursue that and never did pursue that. If I understand your answer, although they may not have been directly involved in the 151 determination, if you will, their testimony supported it? The testimony absolutely did support what we saw. We saw, and Judge Robart made this finding, too. They came in two hunks. The first hunk they plunked down, I don't know how many pages it was. It's one of the exhibits, hundreds of pages. And as the court noted, it was block billed. It was hard to determine where a particular time entry, which was many, many lines long, what, if any, was related. Just even trying to divide it between what was going on in Oregon and Washington was a challenge, and that's what Judge Robart found. And we spelled that out to them, Your Honor, and indicated that based on the best we can do, based on what you gave us at that time, 151 we think is attributable to Washington, and we will pay you that. However, if you want more, you've got to give us more, and you've got to help us understand what, if anything, is related to the one potentially covered claim going on in Oregon. And as it turns out, absolutely nothing. So the 151 was meant to fully compensate for defense costs in Washington, and that action was stayed, and you went into mediation, which ultimately failed, but the 151 was still, was a negotiated price between the parties for the, to compensate for the Washington action. It absolutely was, Your Honor, because in Washington, you know, in our reservation rights we reserve the right, which we're absolutely at liberty to do, the Supreme Court of Washington, the weight case, to allocate between covered and not covered claims. And the one potentially covered claim was this failure to withdraw, which we also reserve the right on if at the end of the day the only damages that would have been awarded under this potentially covered claim is disgorgement of fees, that's excluded from our policy. So we reserve the right that we'll pay you the 151, and at the end of the day in the event that it's only disgorgement, we get that back. Mr. Conlon. Because there would be nothing covered. I'm going to ask for patience. Yes, sir. See if we can go this a little bit slowly. But as I remember reading the record, in the Oregon case, that was a dispute between Beeline and Weinstein as to whether he should sign to sell the shares of Beeline to the $100 million venturer who was trying to buy the company, right? Well, generally speaking, yes. And I don't want to – but you asked. Beeline and the law firm Weinstein and Riley weren't even named as parties until a year after they tendered the Washington case. It was a case primarily against Lone Star and Beeline Holdings. Beeline Holdings, okay. Yes, sir. Against just Mr. Weinstein, and it was purely commercial. To make the sale. Yes. All right. Now, in that Oregon case, was a claim made against Weinstein and Riley for failure to withdraw? Never. Never. Okay. That claim was made in the Washington case. Yes, sir. Then Weinstein attempted to raise that claim that was in the Washington case in the Oregon case by some sort of a counterclaim, right? Yes. It seems odd to me that a counterclaimant should bring into an action claims made against him, not that he's making, but claims made against him. Do I have that wrong? No, that's as I understand it, too. And perhaps I can help have you understand because we were trying to wonder. Because my next question was – Because I think I can explain that. How did the judge ever give even $18,000? That's our point on cross-appeal, frankly. We raised that as an issue, that he got everything right except that. And, again, there is – Maybe counsel will be able to answer that question in rebuttal. Yes. And there were three exhibits that we entered into evidence that the court did not find that's way into the court's opinion but I think is very enlightening. Mr. Weinstein was – The fees that they were looking for in answer to Judge Hawkins' question was $1.8 million. And at the end of the day, Judge Robart found $18,000, so it's 1%. And there's three – Before the pleadings, the counterclaims in the form of an amended answer and counterclaim to bring in, for the first time, Beeline. And mysteriously, by the way, Weinstein and Riley, that's the law firm, was not a party, showed up as a third-party plaintiff, but that's just curious to me. But as that was going on, there were emails that we entered into evidence that Mr. Weinstein was saying we need to inject coverage into this lawsuit. Into this being the Oregon case. Oregon, right, exactly. So what they were trying to do is find a way to get their $1.8 million in a purely non-covered commercial claim. Nobody disputes that. Trying to figure out a way to get his attorney's fees paid is what we gathered from it. Again, that didn't make its way into the opinion, but that's there, and there's three exhibits to that point. And again, they had every chance to explain all this. And in answer to one of Judge Hawkins' questions, they did not object to the specific findings of fact. They're attacking the test. They're reading out of the part, just to put this in context. Again, it's truncated by a bracket. The actual test says it's reasonably related if a reasonably competent defense counsel in the same factual background is defending a case that alleged only that count. And if it's incurred in there and it's reasonably related, it's something that we would pay for. And they want to write that out of that in a case only alleging the covered count because in Oregon there wouldn't be anything. There just wasn't anything. The only thing was there. Take the exhibit, the issue raised by counsel for Weinstein. A deposition is taken in the Oregon case. It takes Weinstein three days to depose. Shouldn't a defense attorney in the malpractice case attend? Well, he wouldn't attend it if there was only a covered count alleged. I mean, that's the whole point. And the Hebula case that we cite, Your Honor, goes through that exact scenario applying the Continental Casualty Test. It says, break it down into three things. Number one, if there's a deposition taken and you can point to us what was dealing with or reasonably related to the covered count, you're on the hook for that. Are lawyers supposed to know this in advance? No, that's the whole point here is in Continental Casualty, if a defense counsel defending a case that only alleges that count, if it's a deposition that's going on in Oregon with Mr. Weinstein, there's nothing to defend. The failure to withdraw claim was abandoned. It was never asserted in Oregon. So using their test, he would not attend that deposition because there's absolutely zero exposure at that point. Well, but if he was being sued at the same time in Washington, any statements that Mr. Weinstein might have made in the Oregon case might come back to haunt the Washington case. Should the Washington counsel be attending the Oregon case? And they had every opportunity, Judge Bay, to present that evidence and didn't. There wasn't one question. There wasn't any evidence. It's their burden. And they did not establish that any of that under the strict Continental Casualty test, which they espoused, would be reasonably related to the defense of the covered claim. Sounds like a very tough test for a lawyer to anticipate the questions that are going to be asked in a deposition where there's no judge present and all of us who have done this kind of litigation know that sometimes lawyers go off the garden path and ask questions. That's a pretty tough burden to put on a lawyer. Well, that is what the test absolutely says, Your Honor, and it's their burden to establish that something happened in a deposition that we should pay for. That's what it comes down to. How about my mere presence prevented the lawyer taking the deposition from asking questions which would impact the other lawsuit? They did not present that evidence. And like you say, Hebele, which went through this whole thing, I agree, it's difficult, but in Washington you can allocate between covered claims and non-covered claims. And it's not like a lot of other states where if you're in for a penny, you're in for a pound. It's a state where you are able to say, we will pay for stuff that deals with a covered claim but not others. And in this case, we offered to defend under a reservation of rights, and that was rejected. And what we ended up doing, which you're absolutely able to do, citing the tank case, the weight case, that we offered to reimburse them for any expenses reasonable and necessary in the defense of that. Yes, sir. Was there any demand by the defense counsel in the Washington malpractice case that they wanted to appear in the Oregon case depositions because they were fearful that their client might be asked questions which would be prejudicial? Your Honor, they didn't demand because we relinquished control of the defense to the place. In which case? In Washington? The covered claim in Washington, yes. And there was nothing for us to defend in Oregon. It's just a matter of whether any of these expenses, again, the court found 1% dealing with this one potentially covered claim. And we paid that. Was there any claim in the Oregon suit that the Weinstein firm or any of its lawyers behaved unethically? Not that I'm aware of. No, I can't. There's a provision in many state ethical rules about the responsibility of a lawyer who's in business with his or her client. Was that ever raised in the Oregon suit? No. And, in fact, Judge Robart found that plaintiffs did not contest that there was only one potential covered claim in either suit, and that was the failure to withdraw in Washington. They did not make any arguments to try to suggest that one of these many counts wrapped in the business dispute was somehow covered. They never made that argument. Judge found that there was nothing covered in any claim ever raised against them in Oregon. And I do point out that the comment was made that no other case has used the test as Judge Robart did, other than continental casualty itself. But PEPCO, with the bracket that they've seized on, applies it exactly like Judge Robart did. If there's two sentences in the opinion in PEPCO, it says, if it was an expense that had been done that was not incurred in the grand jury but would have been incurred if only, and this is the important part, if only the civil case was filed, and they use the words only, if it was only incurred there, then it's reasonably related. If not, no. So, again, it goes back to the continental casualty test that says you assume that there's only a covered count, which is very limiting. But without that, there's nothing to defend. It is an insured beneficial test that is used, frankly. It's something where the insurance company is being asked to pay for defense of a purely uncovered claim. And that's why it is a tough test, as Judge Hawkins pointed out. I have a difficulty understanding you're using a Potomac. If in Potomac the civil case was just covered, and there's also a grand jury proceeding, at which testimony can be given by the person subpoenaed therein, which will affect the civil proceeding. Yes. Is your position that the insurance company has no obligation to advise the insured, as he's called to testify before the grand jury, to sit outside the door and see him come out and ask questions and send him back in? Well, I understand why. I wasn't very articulate in trying to, and I found it here. If I could just read you two sentences, my time's over, and that will answer your question. The two parts of the test is the district court in Pepco held there was an issue of fact that some of the expenses previously allocated to the defense of the grand jury proceedings would have accumulated if there had been no grand jury. Further, Pepco claims that the expenses for these criminal proceedings would have arisen even if there had been only civil proceedings. So they're saying these expenses we want you to cover, even though it was in the grand jury, would have been incurred had we only had to deal with and defend the civil proceeding. I don't follow that, but anyway. Okay. Well, it's those two. It's in Pepco, and it's right before they quote the Continental Casualty Test. There's two sentences, and it talks about had there been only one civil proceeding. Okay. Thank you, counsel. Thank you very much. Mr. Riper. Thank you, Your Honor. Your Honor, to respond to the question you had a few minutes back, when the Washington lawsuit was started, it was immediately tendered to the carrier. There was one and only one telephone conference between the adjuster and the insured, and the adjuster said, I don't think you have any coverage. And the insurer then abandoned the insurer for two and a half months. There was not a word. There was not an inquiry. There was nothing. So the insured had to defend that Washington lawsuit because it had been abandoned. I mean, it assumed the adjuster had decided there was no coverage. That's what he said. So it was defending. Now, in that conference call, Mr. Weinstein said to the adjuster, these are the same claims we've been litigating in Oregon for a year, and it's an attempt to shift the venue. So the defense strategy, when Weinstein was left on his own to have to pay for and defend the Washington suit, the defense strategy is, this is an attempt to change the Oregon venue to Washington. Let's get it stayed. Let's have the entire dispute litigated in Oregon. And then when we get our judgment in Oregon, it's going to be preclusive. There's going to be no ability from our opponents to come back to Washington and try and litigate those claims again. And that, to answer your question, was why in the Oregon lawsuit, as soon as they got Washington stayed, in Oregon they said, there are these claims that we've been fighting here, but they've been realleged up in Washington as malpractice claims. We want declaratory judgment that they are without merit, and we want judgment entered here in the Oregon litigation to foreclose any further. And those were the fated withdrawal claims. Yes. Which other counsel says were abandoned. He claimed, well, a year after the underlying litigation settled, one of the adversary attorneys came in and said, oh, yeah, we decided they weren't very good claims, and so we weren't fighting them hard. There was not a word of any of that in this long war that went on below. There was no abandonment in any piece of paper or any statement anywhere. It was an adverse attorney coming in a year after the litigation was over and saying, yeah, we brought those claims and we sued on them, but we internally decided they really didn't have a lot of strength to them, so we just stopped really fighting those. But that failure to withdraw claim was the entire who's responsible for separating and getting the Weinstein firm out of hundreds of thousands of bankruptcy actions. As attorney. As attorney. Not as owner. Not as owner. When it was Weinstein's adversaries that then controlled the computer database that was necessary to do that. So the whole Oregon fight was over this, okay, the adversaries won't let Weinstein withdraw because he can't on his own, but they're also saying he's required to keep doing the services that he was doing before he was ostensibly fired as the attorney. So that was the fight that was going on in Oregon. Thank you, Your Honor. Thank you. We thank both counsel for the argument. Weinstein and Riley is ordered submitted, and with that the court stands in recess until tomorrow morning. All rise. This court's recessions stands adjourned. Thank you, ma'am. Thank you.
judges: Gould, Bybee, Bea